IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
**(Northern Division)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | CASE NO. 24-CR-0034 RDB |
| v. | * | |
| | * | |
| RODNEY BURTON, | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**AMENDED MEMORANDUM OF LAW IN SUPPORT OF RODNEY
BURTON'S MOTION TO REOPEN DETENTION HEARING AND IMPOSE
CONDITIONS OF RELEASE**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...........................................................................iii

TABLE OF EXHIBITS...........................................................................vi

INTRODUCTION ........................................................................... 1

PROCEDURAL HISTORY ~~...........................................................~~
...............................................................................4

LEGAL STANDARD ........................................................................... 5

ARGUMENT ........................................................................... 8

    I.  This Court should reopen the detention hearing because the original
       detention rationale has collapsed ........................................................ 8

      A.  The Court's concerns about substantial assets allowing for flight are no
          longer true ........................................................................... 8

      B.  The Court's "financial danger" theory was never proven by "clear and
          convincing" evidence ...................................................................
          ~~11~~10

      C.  Mr. Burton is facing far less additional time in custody than when this
          Court initially ordered him detained .........................................................
          ~~12~~11

         1.  The Government's plea offer would likely, if accepted,
             result with less than one additional year in custody ........................
             ~~14~~13

         2.  The applicable Guidelines range calls for significantly less
             incarceration than the Government calculates ...................................
             ~~15~~14

      D.  DOJ would likely not have indicted Mr. Burton
          under its current policy
          ..............................................................~~17~~16

         1.  The Blanche Memo's Core Directives ...............................................
             ~~18~~17

2. DOJ (partially or fully) dismissed § 1960 cases or charges
in the wake of the Blanche Memo ........................................ 2827

II. The 18 U.S.C. § 3142(g) factors support releasing Mr. Burton ...................... 3029

A. Context—the January 29, 2024, SEC Complaint ..................................... 3029

1. HyperFund Chairman Sam Lee ............................................. 3029

2. Brenda Chunga—the Face of HyperFund ............................................. 3534

3. Mr. Burton is not like them—Chairman Lee and the Face of
HyperFund .............................................................. 3635

B. Nature and circumstances of the charged offenses
(18 U.S.C. § 3142(g)(1)) .............................................. 3736

C. Weight of the evidence (18 U.S.C. § 3142(g)(2)) ..................................... 4443

D. History and characteristics (18 U.S.C. § 3142(g)(3)) .............................. 4948

1. The creation of Bitcoin Rodney "From the Basement" allowed Mr.
Burton to help himself and others ....................................... 5049

2. Mr. Burton's family ties to the DMV and his health issues ................ 5756

3. While Mr. Burton's 2007 drug conviction was his "basement," it
allowed him to build respect for the law ............................. 5857

E.  Nature and seriousness of the danger to the community
(18 U.S.C. § 3142(g)(4)) ..................................................
61.............................................................................. 60

III.  Mr. Burton's 12-step release plan ...............................................................
6261

CONCLUSION ...................................................................................................... 65
CONCLUSION ......................................................................................................64

<u>TABLE OF AUTHORITIES</u>

**CASES**

*Securities and Exchange Commission v. Lee et al.*,
No. 24-cv-00296 (D. Md. 2024) ...............................................................*passim*

*Stack v. Boyle*,
342 U.S. 1 (1951) ................................................................................ 1,3

*United States v. Bankman-Fried*,
No. 22-cr-0673 (S.D.N.Y. 2022) ...................................................................
~~39~~38

*United States v. Chapman*,
No. 24-cr-0220 (D.D.C.~~)~~..................................................................
~~29, 2024)~~................................................................ 28

*United States v. Chunga*,
No. 24-cr-0001 (D. Md. 2024)...................................................................
~~38~~37

*United States v. Davis*,
449 F. Supp. 3d 532 (D. Md. 2020)...................................................................
~~61~~60

*United States v. Lee*,
No. 24-cr-0021 (D. Md. 2024) ................................................... ~~38,~~
~~46~~37, 45

*United States v. Madoff*,
No. 9-cr-0213 (S.D.N.Y. 2009) ...................................................................
~~39~~38

*United States v. Pilipis*,
No. 24-cr-0009 (S.D. Ind.~~)~~..................................................................
~~29, 2024)~~................................................................ 28

*United States v. Rodriguez*~~,~~ *et al.*,
No. 24-cr-0082 (S.D.N.Y.~~)~~..................................................................
~~29, 2024)~~................................................................ 28

*United States v. Salerno*,
481 U.S. 739 (1987) ................................................................................ 5, 6

iv

*United States v. Scanlon*,
     No. 24-cr-0682 (D.N.J.) ........................................................
29, 2024) .................................................................... 28

*United States v. Shaheed*,
     455 F. Supp. 3d 225 (D. Md. 2020) ................................................. 7

*United States v. Stewart*,
     19 F. App'x 46 (4th Cir. 2001) .......................................................
1211

*United States v. Storm*,
     No. 23-cr-0430 (S.D.N.Y.) .......................................................
29, 2023) .................................................................... 28

*United States v. Wellington*,
     No. 20-CR-625, 2022 WL 3345759 (D.N.M. Aug. 12, 2022) .........................
16........................................ 15

*United States v. White*,
     No. 3:23-CR-22, 2023 WL 5510306 (E.D. Va. Aug. 25, 2023)
........................17...................................16

*United States v. Wilder*,
     No. 2:24-CR-00123, 2025 WL 2467688 (S.D.W. Va. 2025) ...................11, 61 10, 60

**FEDERAL STATUTES**

18 U.S.C. § 371 ........................................................ 4, 13, 37, 59 12, 36, 58

18 U.S.C. § 1341 ........................................................
37 36

18 U.S.C. § 1343 ........................................................
37 36

18 U.S.C. § 1348 ................................................................

3736

18 U.S.C. § 1956 ................................................................

3736

18 U.S.C. § 1960 ..................................................... *passim*

18 U.S.C. § 3142 ..................................................... *passim*

18 U.S.C. § 3145 ..................................................... 5, 6

18 U.S.C. § 3553(a) ...........................................................

1716

21 U.S.C. § 841 ............................................. 57,

58, 59

21 U.S.C. § 846 ............................................. 57,

58, 59

31 U.S.C. § 5330 ..............................................................

43

**U.S. SENTENCING GUIDELINES**

U.S.S.G. § 2B1.1 ............................................. 14,

15, 16

U.S.S.G. § 2S1.3 ............................................. 14, 15,

16, 17

U.S.S.G. § 3E1.1 ............................................. 15,

16, 17

**OTHER AUTHORITIES**

Alec Karakatsanis, *Usual Cruelty: The Complicity of Lawyers in the Criminal*
    *Injustice System* (2019) .................................................................................. 3,4

DJ Bluetec, "Breakfast Club: Bitcoin Rodney talks cryptocurrency & Reinvent
    Yourself with Crypto conference starting Nov. 18,"
    *HipHop Canada* (Nov. 9, 2021) ........................................................................
5049

Federal Bureau of Prisons, First Step Act of 2018—Time Credit: Procedures for
    Implementation of 18 U.S.C. § 3624(d)(4) (March 10, 2023) ................... 12,
13, 14

"How to purchase crypto/USDT and fund your accts cheap,"
    YouTube (Rodney Burton, Dec. 21, 2020) ......................................................
2524

"Hyper Summit,"
    YouTube (HyperFund, June 23, 2020) ...........................................................
2221

Jennifer Korn, "Why Tom Brady, David Ortiz, Jimmy Fallon
    and other celebrities are getting sued over crypto," *CNN* (Dec. 14, 2022) ....
3433

Memorandum from U.S. Deputy Att'y. Gen. Todd Blanche
    to All Dep't. Employees,
    *Ending Regulation by Prosecution* (Apr. 7, 2025) ................................... *passim*

Sarah Martin, "Asic faces questions over failure to warn consumers about
    HyperVerse crypto scheme," *The Guardian* (Jan. 4, 2024) ..........................
3635

Sarah Martin, "Chief executive of collapsed crypto fund HyperVerse
    does not appear to exist," *The Guardian* (Jan. 3, 2024) ................................
3433

White House Fact Sheet: *President Donald J. Trump Establishes the Strategic*
    *Bitcoin Reserve and U.S. Digital Asset Stockpile* (March 6, 2025) .................
32

**TABLE OF EXHIBITS**

| Exhibit Number | Document |
|:---:|:---|
| 1. | Memorandum from U.S. Deputy Att'y. Gen. Todd Blanche to All Dep't. Employees, *Ending Regulation by Prosecution* (Apr. 7, 2025) (Blanche Memo.) |
| 2. | Chart of 18 U.S.C. § 1960 Cases or Charges (Fully or Partially) Dismissed Post-Blanche Memo. |
| 3. | Detention Hearing Transcript (Jan. 24, 2024) *United States v. Burton*, No. 24-cr-0034 (D. Md. 2024) |
| 4. | Letter from Tracey Marquez to Rodney Burton (Dec. 13, 2024) (Case No. 2025-1703-000029-01) |
| 5. | Carceral Class Transcript for Rodney Burton |
| 6. | Proposed Order |

viii

**INTRODUCTION**

Th[e] traditional right to freedom before conviction permits the unhampered preparation of a ~~Defense~~defense, and serves to prevent the infliction of punishment prior to conviction. Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.

*Stack v. Boyle*, 342 U.S. 1, 4, (1951) (Vinson, CJ) (internal citation omitted).

~~Six~~Seven hundred ~~ninety-nine~~seven days ago, this Court granted the Government's motion to detain Rodney Burton. Those ~~699~~707 days of "punishment prior to conviction" have hampered Mr. Burton's "preparation of a Defense"—his ability to review over 160,000 pages of discovery, interview key witnesses, and raise the needed resources to fight the allegations made by the world's most powerful and richest government. Consequently, Mr. Burton's "presumption of innocence" has "los[t] its meaning." But three material developments—each previously unknown to Mr. Burton at his original detention hearings—now allow this Court to revisit its original detention decision and restore Mr. Burton's "traditional right to freedom before conviction."

**First**, Mr. Burton's financial status has diminished significantly. At the time of the original detention hearing, this Court expressed concern that Mr. Burton had access to a "significant amount of assets," which he might use to flee from fighting his case.[1] But with the passage of time has come the loss of his assets. As a result, any

---

[1] Dkt. No. 14 (Detention Order).

flight risk that Mr. Burton might have posed over ~~22~~23 months ago, because of his assets, has dissipated.

**Second**, the substantial passage of time itself means that Mr. Burton faces far less additional time in custody should he lose this case at trial. This new fact is material to this Court's reconsideration of Mr. Burton's release because it lessens any incentive Mr. Burton has to flee.

**Finally**, there has been a sea change in the executive branch's approach to the regulation of the digital asset (or cryptocurrency) industry. Where the Biden administration viewed the digital asset industry with suspicion and in need of criminal prosecution, the Trump administration sees the digital asset industry as a feature of the American economy. The Trump administration wants to make America the "crypto capital of the world."[2] Unlike President Joe Biden, President Donald Trump favors *civil regulation* over *criminal prosecution* of the digital asset industry. Toward that end, on April 7, 2025, U.S. Deputy Attorney General Todd Blanche issued a memorandum with the subject line "Ending Regulation by Prosecution." (Blanche Memo.)[3] Under the Blanche Memo., DOJ will "no longer pursue litigation or enforcement actions that have the effect of superimposing *regulatory frameworks*

---

[2] White House, Fact Sheet*: President Donald J. Trump Establishes the Strategic Bitcoin Reserve and U.S. Digital Asset Stockpile* (Mar. 6, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-establishes-the-strategic-bitcoin-reserve-and-u-s-digital-asset-stockpile/.

[3] Memorandum from U.S. Deputy Att'y. Gen. Todd Blanche to All Dep't. Employees, *Ending Regulation by Prosecution* (Apr. 7, 2025) (Blanche Memo.) (Ex. 1).

on digital assets while President Trump's actual regulators do this work *outside the punitive criminal justice framework*."[4] In compliance with the Blanche Memo., DOJ dismissed (or partially dismissed) five cases under subsections (b)(1)(A) and (b)(1)(B) of 18 U.S.C. § 1960[5] because these theories of liability are regulatory; they address the failure of a money transmitter to obtain a state license or register with the appropriate federal agency. By contrast, since the Blanche Memo., DOJ has gone to trial under subsection (b)(1)(C) of 18 U.S.C. § 1960 because that theory of liability addresses intentional, criminal misconduct. Mr. Burton's alleged misconduct falls under the regulatory subsections (b)(1)(A) and (b)(1)(B) of 18 U.S.C. § 1960.[6] Accordingly, DOJ should dismiss this case.[7]

In 1951, Chief Justice Frederick Vinson warned that the danger of pre-trial detention is that it will punish people before conviction. *Stack v. Boyle*, 342 U.S. 1, 4

---

[4] *Id.* at 1.

[5] Ex. 2 (18 U.S.C. § 1960 Cases or Charges (Fully or Partially) Dismissed Post-Blanche Memo.)

[6] Dkt. No. 16 ¶ 37 (Indictment) (". . .Rodney Burton. . . did knowingly conduct. . . an unlicensed money transmitting business. . . (1) which was operated without an appropriate money transmitting license where such operation was punishable. . . under State law, and (2) failed to comply with the money transmitting business requirements under 5330 of Title 31, United States Code [i.e., registering with the Treasury Secretary or FinCEN]."

[7] On October 7, 2025, one of the trial prosecutors from the U.S. Attorney's Office informed Defense counsel that his request to speak with the U.S. Attorney and the supervisor, on this case, about the Blanche Memo.'s effect on this case was denied. Yet efforts are ongoing to speak with Justice Department leadership in Washington, D.C. about the Blanche Memo.'s effect on this case.

(1951). In 2019, Alec Karakatsanis amplified the Chief Justice's observation by explaining that reforms to the federal pre-trial detention system resulted in the increase—not the decrease—of presumptively innocent people sitting in a cage for their entire prosecution.[8] Mr. Burton—an innocent man—need not be in that increase. This Court is now presented with three material changes that Mr. Burton did not know ~~699~~707 days ago during his original detention hearings. Accordingly, this Court should: (1) reopen the detention hearing, (2) impose reasonable conditions of release, and (3) restore Mr. Burton's "traditional right to freedom before conviction" under 18 U.S.C. § 3142(f)—particularly because Mr. Burton is both factually and presumptively innocent.[9]

**PROCEDURAL HISTORY**

The relevant procedural history follows. On December 29, 2023, federal law enforcement sought a sealed Complaint against Mr. Burton alleging he operated an unlicensed money transmitting business and conspired to do the same, in violation of

---

[8] Alec Karakatsanis, *Usual Cruelty: The Complicity of Lawyers in the Criminal Injustice System* 73 (2019).

[9] As Mr. Burton and the Government know, this Motion has been a long time coming. To preserve the attorney-client privilege, the work-product doctrine, the duty of confidentiality, and the duty of loyalty, the Defense is not at liberty to detail all the reasons for the delay in this public filing. But some of those reasons are less protected from disclosure because they were revealed at the *sealed* detention hearing of July 8, 2024, before Senior Judge Richard D. Bennett. Sealed Det. Hrg. Tr. (July 8, 2024) 82:3-6. The Defense welcomes an *ex parte* discussion with the Court concerning all the reasons for this Motion's delay—particularly in light of the March 2, 2026, trial date. *See* Dkt. No. 58 (Revised Scheduling Order).

18 U.S.C. § 1960 and 18 U.S.C. § 371.[10] Federal law enforcement arrested Mr. Burton on January 3, 2024, in the Southern District of Florida, where that court ordered him temporarily detained. Little did Mr. Burton know that his temporary detention would devolve into ~~699~~707 days (or ~~2223~~ months and ~~297~~ days) of seemingly permanent detention. Mr. Burton made his initial appearance in the District of Maryland on January 25, 2024.[11] On January 29, 2024, after a detention hearing, this Court (Judge Erin Aslan) granted the Government's Motion to Detain Mr. Burton.[12] On February 7, 2024, a grand jury indicted Mr. Burton on the same two charges that appear in the Complaint.[13]

On June 17, 2024, Mr. Burton's prior Defense counsel filed a Motion seeking review of this Court's Detention Order, under 18 U.S.C. § 3145 (b).[14] The Government responded on July 1, 2024.[15] After a hearing on the Motion, this Court (Judge Richard Bennett) denied Mr. Burton's Motion on July 9, 2024.[16] In sum, Mr. Burton has remained in custody since January 3, 2024—a ~~698~~707-day denial of his right to pre-trial freedom as he fights the Government's false allegations.

---

[10] Dkt. No. 1 (Complaint).

[11] Dkt. No. 6.

[12] Dkt. No. 14.

[13] Dkt. No. 16 (Indictment).

[14] Dkt. No. 27.

[15] Dkt. No. 31.

[16] Dkt. No. 36.

5

## LEGAL STANDARD

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The Bail Reform Act (BRA) of 1984 reflects this reality in its language and structure. For example, the BRA's most important (and perhaps least followed) section states that the criminally accused is presumed innocent at the pre-trial stage. 18 U.S.C. § 3142(j). In his *Salerno* dissent, Supreme Court Justice and former capital defense attorney Thurgood Marshall explained "[t]he principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Salerno*, 481 U.S. at 763 (Marshall, J., dissenting) (internal citation omitted).

In accordance with the presumption of innocence, the BRA presumes the criminally accused *shall* be released on their own recognizance, absent a finding that additional conditions are necessary to reasonably assure the appearance of the accused in court or to protect the community from the accused. *See* 18 U.S.C. § 3142 (b). The court may order the accused to be detained before trial only under specific, limited circumstances, reflecting the general principle of pre-trial release. *See* 18 U.S.C. §§ 3142(f)(1-4). Importantly, if a magistrate judge orders the accused to be detained, the accused still has the right to have that order reviewed by a district judge. *See* 18 U.S.C. § 3145(b).

But that district court review is not the final opportunity to challenge pre-trial release. Acknowledging that new developments can affect the factual and legal

6

underpinnings of a detention decision, Congress allowed courts to revisit their detention determinations. Thus, a court has the authority to reopen a pre-trial detention hearing if it "finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142 (f); *see also United States v. Shaheed*, 455 F. Supp. 3d 225, 228 (D. Md. 2020) (granting emergency motion to reopen detention hearing and ordering pre-trial release of individual charged with drug trafficking following the changed circumstances of a pandemic).

In its arguments for detention due to risk of flight and "financial danger," the Government points to the nature and circumstances of the offense, Mr. Burton's history and characteristics, and the weight of the evidence to contend that no release conditions exist for Mr. Burton.[17] Since those hearings over ~~22~~23 months ago, the support for the Government's contentions has eroded. Accordingly, this Court should

---

[17] Dkt. No. 31 at 4-5; *see also* Sealed Detention Hr'g Tr. (July 8, 2024) 56. This is a sealed transcript and thus, Defense counsel is not providing it as an exhibit. But the transcript shows that non-parties were allowed in the "audience" in the courtroom. *See id.* at 63:17-65:4 (Court asking Defense counsel about address information and family information from family members in the courtroom). Accordingly, undersigned counsel only cites to parts of the sealed transcript concerning information—like the Government's argument or the Court's reasoning—which need not be sealed (in the same way that address information and family information need not be sealed). If requested by the Court, undersigned counsel can provide the July 8, 2024, sealed detention hearing transcript.

7

reopen the detention hearing and find that adequate conditions of release now exist for Mr. Burton.

ARGUMENT

I.    **This Court should reopen the detention hearing because the original detention rationale has collapsed.**

Under the BRA, both Judge Aslan and Judge Bennett concluded that no such conditions existed because Mr. Burton allegedly had: (1) substantial assets, (2) a yacht and luxury vehicles, and (3) an intent to flee to Dubai. Despite the Defense's disagreement with those findings, they were reasonable then. They are not now.

A.    **The Court's concerns about substantial assets allowing for flight are no longer true.**

Judge Bennett found it "abundantly clear that he was getting on an airplane . . . going to Dubai, and he's not coming back." Sealed Detention Hr'g Tr. (July 8, 2024) 56:17–19. He relied on a December 22, 2023, call where Mr. Burton said, "I'll be going to Dubai on January 2nd and I'll actually be moving to Dubai" and "in Dubai also is where it's legal to do crypto." *Id.* at 50:20–21 & 51:19–20. These statements were made before indictment, before detention, and before Mr. Burton had any reason to believe he would spend nearly two years in pre-trial custody.

8

~~Today, the calculus is different. Mr. Burton has already served over 22 months of pre-trial incarceration—almost half of the statutory maximum—and faces, at worst, a few additional years if convicted. Judge Bennett himself acknowledged that "we're not deciding the merits of the case" and that his concern was flight risk at that time (i.e., January 2024). *Id.* at 57:5-7. That time has passed. The incentive to flee has evaporated.~~

~~Moreover, Judge Bennett's and the Government's concerns—"a resident ID card for Dubai," (*Id.* at 9:6-11), "a one-way ticket," (*Id.* at 18:14-16) and Mr. Burton being a purported "sovereign citizen" (*Id.* at 78:21-23) outside the bounds of American law—are historical facts, not ongoing risks, with no current legal weight. The Government seized the passport that pre-trial flagged as a flight concern. The yacht is gone. The Government's own plea offer contemplates a sentence so short that Mr. Burton would serve less than one additional year. These changed circumstances materially alter the § 3142(g) analysis.~~

Judge Aslan detained Mr. Burton because "the nature of the scheme entails resources, it entails assets, it entails cryptocurrency and the exchange of dollars for that cryptocurrency" and because "Mr. Burton is alleged to have access to currency. . . . as part of the nature and circumstances of the offense." Detention Hr'g Tr. (Jan. 24, 2024) 32:10-18.[18] The Court emphasized that "[Mr. Burton] also reported owning multiple vehicles that are significant. . . expensive, a Lamborghini, a Porsche, and a

---

[18] The transcript of the Jan. 24, 2024, hearing is not sealed—like the one for the July 8, 2024, hearing. As a result, the January transcript is attached as Ex. 3.

whole set of other things" (*Id.* at 34:23-25) and that "[Mr. Burton] also ha[s] this yacht. . . [which] can get [him] out of the United States." *Id.* at 34:8-10.[19]

Those facts have changed. The yacht, which the Government viewed as a mode of transportation that could easily be used to "abscond from the country" has been sold—months ago—at a loss, eliminating any concern that Mr. Burton could "jump on a yacht and escape." Detention Hr'g Tr. (Jan. 24, 2024) 15:21-25.[20] Likewise, any luxury cars referenced at the January and July detention hearings have either been seized or are so heavily encumbered that they provide no liquidity. Contrary to the Government's speculation about "millions of dollars in cryptocurrency" (*Id.* at 11:3-8) that Judge Aslan credited (*Id.* at 32:10-14) and Judge Bennett credited (Sealed Detention Hr'g Tr. (July 8, 2024) 79:17-21), the Government has had full access to Mr. Burton's devices and financial records—via multiple subpoenas and search warrants—for nearly two years; it has produced no evidence of hidden crypto wealth

---

[19] The Government's assertion that Mr. Burton attempted to liquidate assets by shipping a Rolls Royce overseas is wrong. The Government argued that "on **May 9, 2024**. . .Customs and Border Patrol in Savannah, Georgia intercepted an unmanifested Rolls Royce. . . bound for Dubai" to show ongoing flight risk and asset concealment by Mr. Burton. Sealed Detention Hr'g Tr. (July 8, 2024) 10:2-6 (emphasis added). Yet U.S. Customs and Border Protection records confirm that the 2022 Rolls Royce Cullinan (VIN: SLATV8C08NU214816) was seized on **November 19, 2024**—more than ten months after Mr. Burton was detained on January 3, 2024—not on May 9, 2024. *See* Letter from Tracey Marquez to Rodney Burton (Dec. 13, 2024) (Case No. 2025-1703-000029-01) (Ex. 4). This timeline undercuts the Government's claim that Mr. Burton was liquidating assets prior to his second detention hearing (in July 2024), so that he could flee if released.

[20] Dkt. No. 35-1 ("Bill of Sale").

to which Mr. Burton has had access. If such assets existed, they would have surfaced long ago.

Judge Bennett found "it abundantly clear that [Mr. Burton] was getting on an airplane. He was going to Dubai, and he's not coming back." Sealed Detention Hr'g Tr. (July 8, 2024) 56:17-19. He relied on a December 22, 2023, call where Mr. Burton said, "I'll be going to Dubai on January 2nd and I'll actually be moving to Dubai" (*Id.* at 50:20-21) and "in Dubai also is where it's legal to do crypto." *Id.* at 51:19-20. Those statements were made before indictment, before detention, and before Mr. Burton had any reason to believe he would spend nearly two years in custody.

Today, the calculus is different. Mr. Burton has already served ~~22~~23 months—almost half of the statutory maximum—and faces, at worst, a few additional years if convicted. Judge Bennett acknowledged basic black letter law that "we're not deciding the merits of the case" (*Id.* at 57:5-6) and thus, his concern about flight risk back in July 2024—not now. Today, the incentive to flee—while not a mathematical nullity—has meaningfully diminished, such that this Court should now have confidence in Mr. Burton's pre-trial release.

Finally, Judge Bennett's other concerns—"a resident ID card for Dubai" and "a one-way ticket" (*Id.* at 9:8-9)—are historical facts, not ongoing flight risks. As mentioned, the Government seized the passport and thus, Mr. Burton cannot leave for Dubai; the yacht is gone. The Government's own plea offer contemplates a sentence so short that Mr. Burton would serve less than one additional year. These

11

changed circumstances materially alter the § 3142(g) analysis and support Mr. Burton's pre-trial yet conditional release.

**B.     The Court's "financial danger" theory was never proven by "clear and convincing" evidence.**

Judge Bennett found that Mr. Burton posed a "financial danger" to the public. Sealed Detention Hr'g Tr. (July 8, 2024) 76:10-19. But financial danger under § 3142(g)(4) requires a nexus between release and ongoing harm before trial. *See United States v. Wilder*, 2025 WL 2467688, at *5 (S.D.W. Va. 2025) (releasing a person accused of gun charges after he had been detained pre-trial) (internal citations omitted). Additionally, the Government must prove danger by "clear and convincing" evidence—such is the standard of proof. *United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001) (internal citations omitted). Here, there is no clear and convincing evidence of an ongoing financial danger. Importantly, neither the Government nor the Court considers the clear and convincing burden of proof in either the January or July detention hearings. That heavy burden was not met then, and it is not met now with the constellation of changed circumstances. Also, Mr. Burton's alleged financial conduct ended years ago in January 2022.[21] He has no access to HyperFund accounts (or its related entities),[22] no operational crypto business, and no ability to engage in

---

[21] Dkt. No. 16 ¶ 16 (Indictment).

[22] Dkt. No. 16 ¶¶ 8-9 (stating the four HyperFund entities are "HyperTech," "HyperCapital," "HyperVerse," and "HyperNation"). In this Memo., "HyperFund" includes all the related entities for ease of reading.

the alleged financial misconduct. As Judge Aslan herself observed, "danger is not a factor here." Detention Hr'g Tr. (Jan. 24, 2024) 35:4-5. That remains true.

### C. Mr. Burton is facing far less additional time in custody than when this Court initially ordered him detained.

Mr. Burton has been in continuous federal custody since his arrest in connection with this case on January 3, 2024, a total of ~~699~~707 days (or over ~~22~~23 months) as of this filing. That passage of time, coupled with new information that was unavailable to Mr. Burton's Defense team at the time of the initial detention hearings, constitute changed facts that materially impact this Court's detention analysis. This Court should therefore reopen the detention hearing and order Mr. Burton's conditional released.

The statutory maximum for 18 U.S.C. § 1960 and 18 U.S.C. § 371 is five years. If Mr. Burton were convicted and sentenced to the longest sentence under the United States Sentencing Guidelines (USSG), he would face approximately 52 months in custody, when accounting for good time credits. Subtracting the ~~22~~23 months he has already served, under this scenario Mr. Burton would have roughly 30 months remaining on his sentence.

But even 30 months overstates the amount of time Mr. Burton would realistically be facing in this worst-case-scenario sentence. Mr. Burton's sentence would almost certainly be further reduced with First Step Act (FSA) credits, which Mr. Burton earns through participation in Evidence-Based Recidivism Reduction

13

programming.[23] Through the FSA, Mr. Burton would be able to accrue between 10 and 15 days of credits for each month that he served of his sentence.[24] Thus, for every 12 months that he served, Mr. Burton could earn between three and four months of custody credits. Once those credits are equal to the remainder of any outstanding sentence, Mr. Burton would be eligible for release on supervision.[25]

In sum, accounting for the good time credits, the FSA credits, and the ~~22~~23 months of time served, Mr. Burton has already completed about half of the worst-case-scenario sentence he could receive for the charged offenses. Any incentive Mr. Burton may have once had to flee from pre-trial supervision has plummeted simply by the long passage of time during his pre-trial detention. As explained below, Mr. Burton is not facing the worst-case-sentencing scenario. Accordingly, the change in Mr. Burton's custodial circumstances alone is sufficient to conditionally release Mr. Burton immediately.

> **1. The Government's plea offer would likely, if accepted, result with less than one additional year in custody.**

---

[23] *See, generally,* Federal Bureau of Prisons, First Step Act of 2018—Time Credit: Procedures for Implementation of 18 U.S.C. § 3624(d)(4), (March 10, 2023), https://www.bop.gov/policy/progstat/5410.01_cn2.pdf.

[24] *See id*. The rate at which Mr. Burton would earn FSA credits would be determined by a risk assessment through use of the Prisoner Assessment Tool Targeting Estimated Risk and Needs. Because of Mr. Burton's age, limited criminal history points, he is almost certain to be determined to be at a minimum or low risk for recidivating. Thus, he is eligible for the full 15 days of FSA credits.

[25] *See id*.

The Government extended Mr. Burton an offer to plead guilty which, if Mr. Burton accepted it,[26] the Government would recommend a sentence below the statutory five-year maximum. Under that plea, the Government would recommend a sentence of 41 months. With good time credit, a sentence of 41 months becomes less than 36 months. That 36-month sentence would then be reduced by FSA credit. Thus, if Mr. Burton elected to accept the Government's offer, even if the Government prevailed in its recommendation at sentencing Mr. Burton would be facing the prospect of less than one additional year in custody—given the ~~22~~23 months he has already served.

> **2.    The applicable Guidelines range calls for significantly less incarceration than the Government calculates.**

Mr. Burton has at least two independent bases for contending that the applicable Guidelines calculations are significantly lower than those the Government wants.[27] First, § 2S1.3 provides that the base offense level for a conviction under 18 U.S.C. § 1960 is 6, "plus the number of offense levels from § 2B1.1 . . . corresponding to the value of the funds." U.S. Sent'g. Guidelines Manual § 2S1.3(a)(2) (U.S. Sent'g Comm'n 2025) (U.S.S.G). The commentary to that section clarifies that "'value of the funds' means the amount of the funds involved in the structuring or reporting

---

[26] In light of the Defense's investigation to date, Mr. Burton rejected the plea offer. Importantly, the Government also rejected the Defense's plea offer.

[27] While the Court need not, and indeed cannot, resolve these legal disputes at this point, Mr. Burton raises them here simply to alert the Court to the fact that he has a good faith reason to believe that his sentencing exposure is less than what the Government suggests.

conduct." U.S.S.G. § 2S1.3 cmt. n. 1. Under the Government's theory of the case, the relevant enhancement, under § 2B1.1, is 18 levels. The Government believes it has identified unlicensed money transmitting transactions in excess of $3,500,000 but less than $9,500,000. *See* U.S.S.G. § 2B1.1(b)(1)(J). But based on the Government-provided discovery, the Defense contends the "value of the funds" is significantly less than $1,000,000. Thus, the § 2B1.1 enhancement is 14. *See* U.S.S.G. § 2B1.1(b)(1)(H).[28]

The Defense contends that the value of funds is less than the Government's calculations because the Government fails to consider that § 1960 makes it illegal to operate an unlicensed money transmitting *business*. While it is not defined by the statute, "the term 'business' is self-explanatory. . . It does require the receipt of a fee, but this goes without saying because businesses are, by nature, enterprises carried out for financial gain." *United States v. Wellington*, 2022 WL 3345759, at *8 (D. N.M. 2022) (internal citations omitted). Here, the Government's discovery and the Defense's investigation reveal that only a small subsection of the crypto transactions allegedly made with Mr. Burton's accounts involved a fee charged to the customer. Thus, instead of the number advocated by the Government, the operative amount appears to be less than $1 million. If the Defense is correct, then the applicable enhancement would be 14 levels instead of 18. *See* U.S.S.G. § 2B1.1(b)(1)(H). Then,

---

[28] As the Court is well aware, it is unsurprising that the Defense and the Government contest where the accused falls on the § 2B1.1 Guideline.

16

keeping everything else the same, that would result in a Guidelines range of 27 to 33 months.[29]

Second, U.S.S.G. §2S1.3 includes a "safe harbor" provision which, where applicable, reduces the offense level by six levels. *See* U.S.S.G. § 2S1.3(b)(3). In order to qualify for the reduction, the accused has the burden of proving that: (1) §§ 2S1.3(b)(1) and (b)(2) do not apply; (2) the accused did not act with reckless disregard of the source of the funds; (3) the funds were the proceeds of lawful activity; and (4) the funds were to be used for a lawful purpose. U.S.S.G. §2S1.3.(b)(3). If Mr. Burton prevails in his argument, it would cut the applicable Guidelines range in his case down to 12 to 18 months.[30] Again, Mr. Burton has already completed ~~22~~23 months of incarceration. Put differently, Mr. Burton has already done more time than the Guidelines advise, and this Court should immediately release him on conditions.

### D. DOJ would likely not have indicted Mr. Burton under its current policy.

On April 7, 2025, Deputy Attorney General Todd Blanche issued a memorandum titled *Ending Regulation by Prosecution*. (Blanche Memo.) (Ex. 1). The Blanche Memo. constitutes "information . . . not known to the movant at the time of the [detention] hearing and that has a material bearing on the issue [of conditions of

---

[29] After the reduction under U.S.S.G. § 3E1.1 and with a Criminal History Category of II, then Mr. Burton faces a guideline range of 17 (Offense Level) and II (Criminal History Category), which equals 27 to 33 months.

[30] After the reduction under U.S.S.G. § 3E1.1 and with a Criminal History Category of II, then Mr. Burton faces a guideline range of 12 (Offense Level) and II (Criminal History Category), which equals 12 to 18 months.

release]" under 18 U.S.C. § 3142(f). Courts can consider DOJ policy shifts when evaluating release decisions. For example, when former Attorney General Merrick Garland issued guidance eliminating the crack-to-powder disparity, Judge Anthony Trenga incorporated that policy into his § 3553(a) analysis for compassionate release. *See United States v. White*, 2023 WL 5510306, at *2 (E.D. Va. 2023). Likewise, this Court should incorporate this new DOJ policy in its analysis of whether conditional release is now appropriate for Mr. Burton.

### 1.    The Blanche Memo.'s Core Directives

The Blanche Memo. directs prosecutors to no longer "pursue litigation or enforcement actions that have the effect of superimposing regulatory frameworks on digital assets." Blanche Memo. 1. The Blanche Memo.'s core directives are two-fold: (1) preventing financial harm to digital asset investors or consumers and (2) preventing the use of digital assets to facilitate serious crimes such as "terrorism, narcotics and human trafficking, organized crime, hacking, and cartel and gang financing." *Id.* Neither directive applies to Mr. Burton. He is charged only with operating an unlicensed money transmitting business and conspiracy—no investor harm and no link to the above-stated serious crimes.[31]

---

[31] *See generally* Dkt. No. 16 (Indictment).

18

The Blanche Memo. further instructs "prosecutors should not charge regulatory violations in cases involving digital assets—*including but not limited to unlicensed money transmitting under 18 U.S.C. § 1960(b)(1)(A) and (B)*—unless there is evidence that the defendant knew of the licensing or registration requirement and willfully violated it." *Id.* at 2 (emphasis added). Mr. Burton is charged exclusively under those subsections (b)(1)(A) and (b)(1)(B) of § 1960.[32] Thus, his case falls squarely in the safe harbor provision of the Blanche Memo. and the Memo.'s two-step exception—(1) knowledge about the licensing and registration requirements and (2) a willful violation of the statute—does not apply.

As explained more fully in Section II, Mr. Burton did not know of the licensing and registrations requirements under 18 U.S.C. §§ 1960(b)(1)(A) and (b)(1)(B) for, at least, two reasons.[33] **First**, Mr. Burton reasonably relied on HyperFund as having all the licensing and registration requirements because of its corporate structure, personnel, and experience. Sam Lee, Jayden Wei, Ryan Xu, Alfred Hew, and others—not Rodney Burton—created HyperFund and constituted HyperFund's corporate structure. Mr. Lee was the Chairman. Mr. Wei was the Chief Executive Officer. Mr.

---

[32] Dkt. No. 16 ¶ 37.

[33] The Government falsely alleges that Mr. Burton knew of the licensing and registration requirements and willfully violated them. *See, e.g.*, Dkt. No. 16 ¶ 18 (Mr. Burton "purportedly offered consulting services" via his businesses, but these business "were in fact unlicensed money transmitting businesses" and they were "never registered" with the proper state and federal agencies); Dkt. No. 16 ¶ 21 (Mr. Burton worked with co-conspirator Brenda Chunga to have investors falsely write "Consultation/Training" on the memo line of checks "to avoid drawing scrutiny from banks" when investors deposited funds via Mr. Burton's businesses).

Xu was the General Counsel. Mr. Hew was the Director of Operations. On June 23, 2020, Mr. Lee, Mr. Wei, Mr. Xu, and Mr. Hew participated in a "Hyper Summit" via YouTube to launch HyperFund.[34] In that YouTube video, they made their titles, governance, and control of HyperFund clear. Additionally, all four men made their considerable experience in cryptocurrency (and blockchain technology) clear.[35] Below are screenshots from YouTube showing all four men—their names and the corporate titles—during the HyperFund launch in June 2020:



---

[34] The June 23 launch date is consistent with the Government's allegations that alleged HyperFund conspiracy wrongly accusing Mr. Burton stared in June 2020. Dkt. No. 16 ¶ 16.

[35] For example, Mr. Lee is known in Australia as the crown prince of blockchain. Mr. Xu is reportedly known as one of China's Four Bitcoin Kings.





Importantly, Chairman Lee made clear in the YouTube video that HyperFund is following all the appropriate regulations. For example, Chairman Lee explained, "We have been able to successfully have the regulatory participation to help Blockchain, and **especially cryptocurrencies become a legal part of the new economy**."[36] Toward that end, HyperFund not only hired Mr. Xu as its General Counsel, but also, HyperFund hired Compliance Manager Hope Hill. The email address for Compliance Manger Hill was—compliance@thehyperverse.net. At no time, despite HyperFund's knowledge of how Mr. Burton brought investors (including himself) to HyperFund, did a HyperFund lawyer or compliance officer inform Mr. Burton that he needed to register and/or license the Burton entities with a state or federal regulator. Thus, Mr.

---

[36] "Hyper Summit," YouTube (HyperFund, June 23, 2020), https://www.youtube.com/watch?v=Hj1icrn1iGI (at 20:38–20:55) (emphasis added).

Burton did not know of the licensing and registrations requirements under 18 U.S.C. §§ 1960(b)(1)(A) and (b)(1)(B).

**Second**, Mr. Burton conducted his due diligence about HyperFund and his role in HyperFund by visiting the HyperFund corporate offices in Dubai, United Arab Emirates and in Hong Kong, China. A photo from the Dubai office appears below where Mr. Burton is standing next to Chairman Lee:



In the following photo, Mr. Burton is with the HyperFund employees at the Hong Kong, China, HyperFund office:

23



During these trips, Mr. Burton interviewed HyperFund's corporate management. He met with HyperFund's employees. He toured the HyperFund offices in both international cities. He interrogated how HyperFund works. He asked about his approach to his own investment in HyperFund. He inquired about his approach to helping other people invest in HyperFund. At no time, did anyone from HyperFund mention 18 U.S.C. § 1960 and thus, Mr. Burton never knew about licensing or registering his entities for his work with HyperFund.

24

Finally, if Mr. Burton did not know about 18 U.S.C. § 1960 in 2020 to 2022, then he could not have willfully violated the statute. But the Government offers a counterfactual to support its argument that Mr. Burton must have known about the statute. According to the Government, Mr. Burton instructed investors to place "Consulting" in the memo line for checks sent to Mr. Burton's entities to hide that Mr. Burton took fiat currency (the checks) and transferred it into cryptocurrency; the Government contends there were no consulting services offered by Mr. Burton.[37]

As discussed more fully in Section II, there were consulting services offered by Mr. Burton. Mr. Burton goes by the moniker "Bitcoin Rodney" because he is a "lifestyle brand." Part of that brand includes consulting or advising people on how to ~~by~~buy cryptocurrency like Bitcoin. The following screenshot from a December 21, 2020, video from YouTube: 1) shows Mr. Burton's brand, 2) demonstrates his financial literacy consulting, and 3) further proves that Mr. Burton did not engage in the fraud alleged under 18 U.S.C. § 1960:[38]

---

[37] *See, e.g.,* Dkt. ~~No~~Nos. 16 ¶ 18 (Mr. Burton "purportedly offered consulting services" but was engaging an unlicensed money transmitting business) & ¶ 21 (Mr. Burton instructed investors to place "Consultation/Training" on the memo line of checks "to avoid drawing scrutiny from banks, even though no consulting services were rendered.").

[38] "How to purchase crypto/USDT and fund your accts cheap," YouTube (Rodney Burton, Dec. 21, 2020), https://youtu.be/km8I_6ucSsQ?si=w02U0huCGUf5kbRz.





**First**, the Bitcoin Rodney brand—notice his hat sports the Bitcoin Rodney logo; the logo is also at the bottom right hand corner of the screen. His social media handle, website, and other contact information are present at the top of the gray box in the video, so the World can "follow, like, and subscribe" to the Bitcoin Rodney lifestyle.

26

**Second**, from the title of the video ("how to purchase crypto. . . "), Mr. Burton is consulting or advising potential investors on buying crypto. Consulting or advising investors about crypto is one reason Mr. Burton goes by "Bitcoin Rodney."[39] That is part of his brand. As Judge Aslan remarked, "cryptocurrency is legal." *Detention Hr'g. Tr.* (Jan. 24, 2024) 32:12-13. **Third**, this video is an excellent rebuttal to the fraud alleged in the Indictment. Mr. Burton has a "Disclaimer" on the video which reads (in part), "You should not buy any crypto currency products unless you are prepared to sustain a total loss of the money you have invested plus any commission or other transaction charge."[40] Typically, a person engaged in crypto fraud does not tell the crypto investor/putative victim not to invest because they might suffer a "total loss." But, Mr. Burton did because he was not engaged in fraud. He was not engaged in a *knowing* unlicensed or unregistered money transmitting business. Importantly, Mr. Burton provides a link for people to use another company—not his companies—to exchange fiat currency (e.g., dollars) for crypto (i.e., www.oleplatform.com). Mr. Burton could have gone through his own entities to convert fiat currency to crypto (as the Government alleges); he would have made more money by offering this service

---

[39] Like most people in the cryptocurrency industry, Mr. Burton's credentials for consulting or advising potential investors (including himself) comes from experience. As Mr. Burton publicly admits, he lost millions and he has won millions investing in crypto. It is his unique experience for which people pay money.

[40] Defense investigation confirms that Mr. Burton not only stated this disclaimer on YouTube, but also, he stated this disclaimer verbally and publicly in other venues. For example, he verbally and publicly stated this disclaimer while appearing on the popular nationwide radio show the *Breakfast Club* on November 9, 2021, and at his "Reinvent Yourself with Crypto" conference in Miami, Florida also in 2021. The latter is expanded on in Section II.

27

via the Bitcoin Rodney entities. He did not because, as explained in Section II, Mr. Burton was not a fraudster cravenly trying to maximize his money at the expense of investors. In sum, Mr. Burton never knowingly violated 18 U.S.C. § 1960, and thus, under the Blanche Memo., this case should be dismissed.

> **2. DOJ (partially or fully) dismissed § 1960 cases or charges in the wake of the Blanche Memo.**

The Blanche Memo. was not aspirational; it mandates the closure of "ongoing investigations that are inconsistent with [the Memo.]." Blanche Memo. 2. After the Blanche Memo., DOJ dismissed (fully or partially) no less than five cases or charges under 18 U.S.C. § 1960, including cases far larger and more complex than Mr. Burton's. To be clear, for some of these cases, DOJ does not explicitly and publicly state its reasoning for dismissing the entire case or dismissing a charge under 18 U.S.C. § 1960. That is typical. All of the dismissed cases or charges involved 18 U.S.C. § 1960 and came after the April 7, 2025, Blanche Memo. In the wake of the Blanche Memo. (and as the chart (Ex. 2) below demonstrates), DOJ dismissed cases under subsections (b)(1)(A) and (b)(1)(B)—the subsections that Mr. Burton faces—and proceeded to trial under the more serious subsection (b)(1)(C) of 18 U.S.C. § 1960—the subsection that Mr. Burton does not face. The five dismissals (full or partial) are captured in the following chart:

**18 U.S.C. § 1960 Cases or Charges (Fully or Partially) Dismissed Post-Blanche Memo. (Ex. 2)**

| No. | Case | Court | Date | Full or Partial Dismissal |
|-----|------|-------|------|---------------------------|
| 1 | *U.S. v. Pilipis*, No. 24-cr-0009 | S.D. Ind. | April 23, 2025 | Entire case dismissed |
| 2 | *United States v. Scanlon*, No. 24-cr-0682 | D.N.J. | April 30, 2025 | Entire case dismissed |
| 3 | *United States v. Storm*, No. 23-cr-0430 | S.D.N.Y. | May 15, 2025 | § 1960(b)(1)(B) charge dismissed. Conviction on § 1960(b)(1)(C) conspiracy after trial. |
| 4 | *U.S. v. Rodriguez et. al*, No. 24-cr-0082 | S.D.N.Y. | June 24, 2025 | Superseding indictment dropped § 1960(b)(1)(B) charge. Guilty plea to § 1960(b)(1)(C) conspiracy. |
| 5 | *United States v. Chapman*, No. 24-cr-0220 | D.D.C. | July 24, 2025 | § 1960(b)(1)(B) charge dismissed at sentencing for a plea. |

Mr. Burton's case belongs on this chart as the sixth dismissal. Mr. Burton's indictment rests entirely on §§ 1960(b)(1)(A) and (B)—precisely the provisions DOJ has deprioritized. His alleged conduct caused no investor harm, was regulatory and not criminal under the Blanche Memo., and lacked any willful violation of licensing requirements. Under current DOJ policy, this case would have been closed, not pursued. This constitutes "new and material information" under 18 U.S.C. § 3142(f) and strongly supports reopening the detention hearing and imposing reasonable conditions of release.

29

## II.    The 18 U.S.C. § 3142(g) factors support releasing Mr. Burton.

For the reasons explained above and for those detailed below, the four 3142(g) factors support ordering Mr. Burton's conditional release. The central question in this case is whether a reasonable person in Mr. Burton's position—who relied on:

1. in-person international due diligence interviews with company personnel,
2. *Bloomberg*-verified executives,
3. *Amazon Prime* documentary coverage,
4. official corporate registration of predecessor companies with multi-year operational histories,
5. a university partnership,
6. a designated compliance officer,
7. a company general counsel,
8. mainstream press coverage,
9. endorsements by celebrities, and
10. an endorsement by the co-founder of Apple

would have known that licensing or registration were required for his HyperFund-endorsed actions. The answer is no. But to better understand the answer and thus, to be able to appropriately analyze the four 3142(g) factors, context is needed about certain key facts.

### A.    Context—the January 29, 2024, SEC Complaint

#### 1.    HyperFund Chairman Sam Lee

To better understand the central question (and analyze the four 3142(g) factors), some context is needed about HyperFund Chairman Sam Lee and the "face of HyperFund" Brenda Chunga—two key players in the HyperFund fraud that trapped Mr. Burton and many others. On January 29, 2024—26 days after the

Government detained Mr. Burton[41]—the Securities and Exchange Commission filed a comprehensive civil complaint against Sam Lee and Brenda Chunga, charging them with orchestrating a $1.7 billion global pyramid and Ponzi scheme through HyperFund. *See Securities and Exchange Commission v. Xue Samuel Lee and Brenda Indah Chunga*, Case No. 24-cv-00296 (D. Md. 2024), Dkt. No. 1 (SEC Complaint). The SEC's detailed findings, based on extensive investigation, establish that Mr. Lee and Ms. Chunga—not Mr. Burton—were the architects and knowing perpetrators of the HyperFund fraud. Mr. Burton is conspicuously not mentioned anywhere in the 31-page-SEC Complaint—a telling omission that speaks volumes about Mr. Burton's no knowledge of this fraud.

The SEC Complaint establishes that Mr. Lee was "centrally involved with HyperFund throughout its lifecycle." SEC Complaint ¶ 5. As co-founder of the HyperTech Group (a part of HyperFund), Mr. Lee created the fraudulent infrastructure and maintained control over HyperFund through all of its rebranding iterations—from HyperFund to HyperVerse to HyperNation. *Id.* ¶ 25. Critically, Mr. Lee admitted that HyperTech Group was not engaged in large-scale bitcoin mining—one of the key representations used to attract investors—and acknowledged that "mining's not profitable." *Id.* ¶ 78. Mr. Lee explicitly admitted that he knew "a lot of

---

[41] Neither Party discussed the significant effect of this SEC Complaint on Mr. Burton's pre-trial freedom at the January 2024 or the July 2024 detention hearings. As a result, and given the exhaustive investigative process required for the SEC to file a complaint, the Defense takes considerable effort detailing the SEC's findings. Again, understanding this SEC context, will better allow the Court to analyze the four § 3142(g) factors.

the narrative that was promoted to the HyperCommunity is inaccurate" regarding bitcoin mining operations. *Id*. ¶ 79.

Despite his knowledge, Mr. Lee allowed the false representations to continue and "did not alter the messaging made available for HyperFund presentations." *Id*. ¶ 80. For example, Mr. Lee knew that "Steven Reece Lewis," presented as HyperVerse's CEO during the December 2021 launch event,[42] was actually "a paid actor" from Bangkok, Thailand—not a real executive. *Id*. ¶¶ 49-50, 83. This elaborate deception, which included fabricating Lewis's credentials as a derivatives trader at a major investment bank, demonstrates the sophisticated nature of the fraud that Mr. Lee orchestrated and how far he went to deceive investors—including Mr. Burton. *Id*. ¶¶ 81-83. Below is a photo of the fake HyperFund CEO Steven Reece Lewis at the fake HyperFund[43] presentation:

---

[42] This is a second launch event for HyperFund or HyperVerse. The initial launch event in June 2020 is discussed in Section I.

[43] Again, "HyperFund" is used throughout this Motion to represent all the various entities connected to it, including "HyperVerse."



Worse, Mr. Burton was not the only public persona deceived by Chairman

Lee in December 2021. Chairman Lee and others also deceived celebrities and a co-

founder of Apple. According to a report in *The Guardian*, for this 2021 launch,

HyperFund received endorsements from actor Chuck Norris (who gave a "shout out"

to HyperFund stated that "under the leadership of CEO Steven, [HyperFund] will

be the leader of metaverse space"[44]), comedian Jim Norton (who described

HyperFund as a "decentralised [sic] metaverse platform with infinite possibilities"

and stated "I strongly believe Steven will lead [HyperFund] to success. Let's all join

the [HyperFund]. What are you waiting for? Do it now."), and Apple co-founder

---

[44] The "metaverse" is the next generation of the Internet where one can live in a
completely virtual world.

Steve Wozniak (who lauded "I'm here to support Steven and [HyperFund]" and "I can't wait for the HyperVerse").[45][46]

In another lie, HyperFund falsely claimed affiliation with DigitalX, which publicly disavowed any connection in February 2021. SEC Complaint ¶¶ 68-70. Mr. Lee continued to tout the success of his prior company—Blockchain Global—even after it had "entered 'voluntary administration' (a self-administered restructuring procedure), owing creditors a reported $21 million" and Mr. Lee had "stepped down as a director" in March 2019. *Id.* ¶¶ 71-73.

In another lie, HyperFund falsely claimed that Hcash (another one of Mr. Lee's companies) was working "alongside IBM." But, "IBM was not involved with Hcash." *Id.* ¶ 74.

---

[45] Sarah Martin, "Chief executive of collapsed crypto fund HyperVerse does not appear to exist," *The Guardian* (Jan. 3, 2024), https://www.theguardian.com/technology/2024/jan/04/chief-executive-of-collapsed-crypto-fund-hyperverse-does-not-appear-to-exist.

[46] Importantly, unlike Mr. Burton, the Government chose to prosecute none of these endorsers or "promoters" of HyperFund. That is the correct choice because they—like Mr. Burton—had no operational control over HyperFund, according to the Defense's investigation. They and Mr. Burton are analogous to the celebrities (like Tom Brady, Madonna, Gwyneth Paltrow, David Ortiz, and others) who promoted the failed crypto exchange FTX run by Sam Bankman-Fried. Unlike Mr. Burton, many of the FTX celebrities allegedly failed to disclose the compensation (and equity), they had in FTX. *See* Jennifer Korn, "Why Tom Brady, David Ortiz, Jimmy Fallon and other celebrities are getting sued over crypto," *CNN* (Dec. 14, 2022), https://www.cnn.com/2022/12/14/tech/celebrity-crypto-lawsuits/index.html. Thus, by their equity, these FTX celebrities had some level (even if minor) of operational control over FTX. Again, Mr. Burton had no equity and no operational control over HyperFund. These FTX celebrities were not criminally charged by DOJ—neither should Mr. Burton be.

In sum, Mr. Lee knew of these lies. He "was aware or recklessly disregarded that HyperFund's marketing materials used to recruit investors contained material misstatements." *Id.* ¶ 25. Mr. Burton did not know of these lies.

### 2.    Brenda Chunga—the Face of HyperFund

The SEC Complaint establishes that Brenda Chunga was "one of HyperFund's top promoters and *arguably the face of its United States presence.*" SEC Complaint ¶ 6 (emphasis added). She "received over $3.7 million, both from the platform and directly from investors," which she used to fund "extravagant personal expenses" including "expensive custom-made jewelry and clothing, a BMW, designer handbags, a $1.2 million home in Severna Park, Maryland, and a $1.1 million condominium in Dubai." *Id.* ¶ 46. She achieved the highest promoter level—"VIP 5 STAR"—which required generating at least $5 million in new investments. *Id.* ¶ 42. The SEC found that "Chunga knew, or was reckless in not knowing, that these [HyperFund] presentations contained materially false and misleading statements and omissions." *Id.* ¶ 41.

Importantly and by contrast, Mr. Burton never made a presentation for HyperFund. HyperFund did not consider Mr. Burton to be on the official roster of presenters. Unlike Ms. Chunga, Mr. Burton did not have operational control over what HyperFund told investors. Ms. Chunga did. To be clear, by force of his lifestyle brand "Bitcoin Rodney," Mr. Burton attracted many people to HyperFund and HyperFund even considered him a 5-Star promoter. But unlike the Face of

35

HyperFund, Mr. Burton never made a presentation for HyperFund, had marketing control over HyperFund, or operational control over HyperFund.

Ms. Chunga "ignored numerous red flags about HyperFund." *Id.* ¶ 106. She knew about or recklessly disregarded the British Financial Conduct Authority's scam warning in March 2021. *Id.* ¶ 106. She learned that Blockchain Global (a precursor to HyperFund linked to Sam Lee) had collapsed in December 2021, yet continued promoting HyperVerse using Blockchain Global as evidence of "credibility" as late as March 2022. *Id.* ¶ 107. She learned about online articles labeling HyperFund a Ponzi scheme but "ignored it." *Id.* ¶ 108.[47] She "ignored withdrawal issues regarding HyperFund when investors raised them" and especially when "those challenges became more significant starting in November/December 2021." *Id.* ¶ 109. Despite all these red flags, Ms. Chunga continued promoting HyperFund and personally profited to the tune of $3.7 million.

### 3. Mr. Burton is not like them—Chairman Lee and the Face of HyperFund.

In contrast, Mr. Burton had nothing to do with the misconduct of Chairman Lee and the Face of HyperFund (Brenda Chunga). The SEC's extensive investigation

---

[47] In discussions with the Defense, the Government contended that Mr. Burton also knew of these red flags and thus harbored some level of guilty *mens rea* for 18 U.S.C. § 1960. The Government is wrong. Investing in crypto is always risky. More importantly, while the Britain Financial Conduct Authority issued a scam warning against HyperFund, Chairman Sam Lee is Australian and the Australian Securities and Investments Commission—the primary regulator of HyperFund—did not issue such a warning. *See* Sarah Martin, "Asic faces questions over failure to warn consumers about HyperVerse crypto scheme," *The Guardian* (Jan. 4, 2024), https://www.theguardian.com/technology/2024/jan/04/asic-faces-questions-over-failure-to-warn-consumers-about-hyperverse-crypto-scheme.

Case 1:24-cr-00034-RDB     Document 67-1     Filed 12/09/25     Page 46 of 74

identified Chairman Lee as the architect, who controlled the fraudulent enterprise and knew about the false representations. The SEC tagged Ms. Chunga as the Face of HyperFund U.S.A. She ignored obvious red flags and personally enriched herself.

Mr. Burton is not like them. After its investigation into HyperFund, the SEC did not sue Mr. Burton. He did not create HyperFund's fraudulent infrastructure. He did not control HyperFund's operations. He did not ignore red flags and continue promoting after clear problems emerged. On the contrary, when withdrawal issues surfaced, Mr. Burton immediately ceased all activity, publicly demanded participants be paid, offered his own HyperFund rewards to help victims (despite himself being a victim-investor in HyperFund), and refused to participate in the successor scheme that Ms. Chunga and others continued to promote. The Court should consider this important context as it evaluates the four § 3142(g) factors.

**B.    Nature and circumstances of the charged offenses (18 U.S.C. § 3142(g)(1))**

The nature and circumstances of the charged offenses heavily weigh in favor of setting conditions of release for Mr. Burton. The Indictment does not charge Mr. Burton with fraud—simply a conspiracy to violate a regulatory crime. 18 U.S.C. §§ 371 & 1960. The Indictment does not use the word "Ponzi." It does not allege mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, money laundering under 18 U.S.C. § 1956, or securities fraud under 18 U.S.C. § 1348. As explained, this case is fundamentally a regulatory violation concerning licensing requirements under state and federal law. As explained in Section I., this is a case that the Trump DOJ should dismiss under the Blanche Memo.

37

The Government's charging decisions—both criminal and civil—speak with one voice. Chairman Sam Lee and the Face of HyperFund U.S.A. Brenda Chunga were the knowing perpetrators of the HyperFund fraud. The SEC charged both the Chairman and the Face of HyperFund with violating the antifraud provisions of the federal securities laws, finding that they "made materially false and misleading statements about the investments and knowingly or recklessly engaged in a scheme to defraud investors—bilking the investors out of over $1.7 billion." SEC Complaint ¶ 9. Also, DOJ charged Chairman Lee with conspiracy to commit securities fraud and wire fraud in connection with a $1.89 billion fraud scheme. *See United States v. Lee*, Case No. 24-cr-0021, (D. Md. 2024), Dkt. No. 8 (Superseding Indictment). The Government mentions Ms. Chunga in Mr. Lee's Superseding Indictment. *Id.* at ¶ 4. By contrast, Mr. Burton is not mentioned in Mr. Lee's Superseding Indictment. Finally, Ms. Chunga pleaded guilty to DOJ conspiracy charges and admitted to knowingly participating in the fraud, personally receiving over three million dollars in proceeds, and continuing to promote the successor scheme even after withdrawal issues emerged. *See United States v. Chunga*, Case No. 24-cr-0001, (D. Md. 2024), Dkt. No. 10 (Plea Agreement).[48] Mr. Burton does not appear in Ms. Chunga's charging documents.

---

[48] According to the docket, it took only 20 days—from Information to Plea Agreement—for the Face of HyperFund U.S.A. to plead guilty. The Government supports Ms. Chunga's pre-trial freedom. By contrast, Mr. Burton rejected the Government's plea offer. The Government does not support Mr. Burton's pre-trial freedom, despite its explicit admission by its charging decisions—both criminally and civilly—that Mr. Burton's alleged misconduct is less than Ms. Chunga's

Not only is Ms. Chunga out on pre-trial release, but also, the principals of some of the largest frauds in history secured their release from custody pending trial. For example, Bernie Madoff, the perpetrator of the largest Ponzi scheme ever, who was eventually sentenced to 150 years in prison for his crimes, was nevertheless released pre-trail. *United States v. Madoff*, Case No. 9-cr-0213, (S.D. NY 2009), Dkt. No. 15. (Order denying government request for detention). So too was Sam Bankman-Fried (before he was remanded for violating his conditions of release), despite being the founder of a cryptocurrency exchange whose fraud-fueled collapse cost investors billions of dollars. *United States v. Bankman-Fried*, Case No. 22-cr-0673 (S.D. NY 2022), Dkt. No. 13 (Release/Bail Disposition Order).

Mr. Burton acted as an independent advisor who believed in good faith that he was supporting a legitimate cryptocurrency platform backed by substantial corporate infrastructure. The SEC's Complaint confirms that the fraudulent infrastructure was created and controlled by Chairman Lee, not Burton. The material misrepresentations were made or approved by Mr. Lee and Ms. Chunga, not Burton. The decision to block withdrawals in April 2022 was made by the platform's operators—Lee and Ryan Xu—not Burton, who had no operational, governance, or corporate control over HyperFund.

In June 2022, Mr. Burton learned that HyperFund was persistently not returning money to investors. Mr. Burton immediately ceased all promotional

---

admitted misconduct. The Government's disparate treatment of Mr. Burton is unfair, at best, vindictive, at worst.

activity. On June 13, 2022, Mr. Burton texted HyperFund management, asked again for the funds to be returned to investors, so that they can be "made whole." Those text messages follow:



On June 18, 2022, Mr. Burton again texts with HyperFund management and directs them to "take all of my pending rewards (i.e., investment in HyperFund) 45 million plus and. . .give it to those who need it on my team." That series of text messages

follows with a screenshot of Mr. Burton's HyperFund account showing the over 45 million in his account:



On June 22, Mr. Burton made his private communications with HyperFund management public. He wrote a public Facebook post (below) in which he explained: 1) that he had reached out to "management" to correct the problem, 2) demanded that investors (i.e., "his team") be paid or he would resign, and 3) offered 45 million in his own rewards/investment in HyperFund to help his team. The post appears below:

41



**Rodney Burton**
Jun 18, 2022 · 🌐

Good morning or Good evening  depending where you are in the world.
So let me address the elephant 🐘 in the room. Tons of individuals are wondering my thoughts and moves on the past events of HV.
Well, I have messaged management several times to get info on what's there next best move since they were having a pause in withdrawals.

Well, after several days of no answers, I was finally granted with a meeting with management who had laid out a new plan for a new deal HN.

I agreed to try to move fwd as long as I and my team was awarded there pending or current withdrawals. I expressed that my team must get paid in a certain amount of time or I would move fwd and resign.

After no response or seeing any major changes from the management, I had to let this go and ask them to relinquish my pending and current rewards to be sent to my team if possible as seen below.

At the end of the day of ppl who know me I'm a team player and I want the whole team to win. I know there will be haters and ppl who will point me out as the villain but as you can see below I think I did all I can that makes sense.

However, they assured me they have a plan to make most ppl complete and I will do my best to stay in touch with them for future updates to help you.

So now you have the info straight from me and now I'm moving on to bigger and better things.

Thanks for taking the time to read this.

Mr. Burton's conduct is fundamentally inconsistent with the knowing and willful violation that § 1960 requires.

When Mr. Burton resigned from HyperFund in June 2022, he also refused to participate in HyperNation, the successor scheme that launched after HyperFund's collapse. SEC Complaint ¶¶ 57-58. He was transparent with his team, informing them that he would not participate in the new venture.

In contrast, Ms. Chunga and several other leaders continued to promote HyperNation and recruit new members even when they knew HyperFund was a

42

failure. On September 30, 2022, HyperNation even announced that "Chunga was appointed to be the HyperNation Sales Manager for the U.S." *Id.* ¶ 58. If Mr. Burton had possessed guilty knowledge of fraud, he would have continued promoting the successor scheme like Ms. Chunga did, attempting to recoup his losses or continue profiting. Instead, he did the opposite, demonstrating his genuine belief that he had been promoting a legitimate opportunity and his refusal to continue once problems became apparent. Below is the December 2022 promotional material for HyperVerse (with Brenda Chunga on the far left):



In sum, the nature and circumstances of the offense support Mr. Burton's release on conditions. The regulatory nature of the charge against Mr. Burton, the SEC's detailed findings identifying Mr. Lee and Ms. Chunga as the knowing fraudsters, Mr. Burton's absence from both the SEC complaint and the fraud

indictments against Lee and Chunga, and the stark contrast between Mr. Burton's good-faith conduct and the knowing fraud of Mr. Lee and Ms. Chunga all point to one conclusion.

### C.    Weight of the evidence (18 U.S.C. § 3142(g)(2))

To convict Mr. Burton under 18 U.S.C. § 1960, the Government must prove beyond a reasonable doubt that he knowingly conducted a money transmitting business, that he knew such a business required licensing under state or federal law, and that he knew the business lacked proper licensing. Knowledge and willfulness are essential elements of the offense. The weight of the evidence, including the SEC's detailed findings about who actually operated and controlled HyperFund, demonstrates that Mr. Burton lacked the required knowledge.

As explained in Section I, Mr. Burton conducted extraordinary due diligence that would be wholly inconsistent with knowledge that he was promoting an unlicensed or fraudulent business. He personally traveled to Hong Kong and Dubai to visit HyperFund's corporate offices. He met directly with ownership and conducted face-to-face interviews with the executive team. He documented these visits with photographs showing him with Sam Lee at HyperFund headquarters, with the broader executive team, and at the HyperFund corporate facilities. He created video records of these visits. A guilty person who knowingly participated in an unlicensed or fraudulent business would not spend thousands of dollars on international travel, meet executives face-to-face at corporate headquarters, document his presence with photographs, and create permanent video records. This conduct is entirely consistent

44

with a good-faith belief in the legitimacy of what Mr. Burton was doing for HyperFund. This conduct is entirely inconsistent with guilty knowledge.

The apparently legitimate corporate infrastructure that Mr. Burton relied upon was deliberately created by Sam Lee and others to deceive investors. The SEC's Complaint establishes that this infrastructure was part of the fraud. Chairman Lee and his co-founders launched HyperFund in June 2020. SEC Complaint ¶¶ 2, 18-21. They issued a press release through a paid service describing HyperFund as a legitimate blockchain technology venture. *Id.* ¶ 18. They created promotional materials featuring the purported credentials and business experience of the founders. *Id.* ¶¶ 22-25. They arranged for HyperFund (i.e., General Counsel Ryan Xu and Chairman Sam Lee) to be featured in a 2021 documentary on *Amazon Prime* about blockchain technology.



**Amazon Prime hyperfund promo Next Blockchain Documentary EPISODE 6 , Ryan XU & Hyperfund**

They ensured that executives were profiled on *Bloomberg*. They maintained official corporate registrations for multiple entities. They obtained mainstream press

45

coverage through outlets like *PR Newswire* and *Sky News*. They arranged a partnership with Monash University in Australia. They displayed a designated Compliance Manager (Hope Hill). In the Summer of 2021, Mr. Lee had the "Compliance Director," who used a fake name and had a conviction for wire fraud, boast on YouTube of 10 years of experience in compliance. *See United States v. Lee*, Case No. 24-cr-0021, (D. Md. 2024), Dkt. No. 8 ¶¶ 24-26 (Superseding Indictment). They used celebrities like Chuck Norris and business titan Apple co-founder Steve Wozniak to promote HyperFund. This sophisticated deception was designed to create the appearance of legitimacy—and it deceived reasonable people like Mr. Burton.

Mr. Burton reasonably relied on official corporate registrations and documented operational histories. Blockchain Global, Collinstar Capital, and the HCash Foundation all had formal registrations, public filings, and multi-year operational records. HCash, for example, operated actively from 2017 through 2023. These were not shell entities created overnight; they were established companies with documented histories. A reasonable person dealing with officially registered corporations having years of operational history would not question whether proper licensing was in place under 18 U.S.C. §1960. The SEC Complaint does not allege that these corporate registrations were fake—only that the companies were used to perpetrate fraud. SEC Complaint ¶¶ 16-17, 22. Mr. Burton's reliance on these corporate structures was reasonable.

Mr. Burton acted solely as an advisor—as Bitcoin Rodney—not as an operator of the platform. As explained in Section I., he advised interested individuals to

46

purchase cryptocurrency independently through established third-party exchanges. He instructed them to control their own wallets and private keys. He encouraged them to make their own informed investment decisions. He provided educational content about cryptocurrency and blockchain technology generally. This is the conduct of an advisor sharing information, not the conduct of someone operating an illegal and unlicensed money transmitting business. The SEC Complaint confirms that the platform's operations were controlled by Lee and others—not by advisors like Burton. SEC Complaint ¶¶ 5, 25.

Mr. Burton never gave official corporate presentations for HyperFund—like Mr. Lee and Ms. Chunga. His name does not appear on any of the official corporate presentation schedules for 2021 or 2022. He was not listed among the designated corporate HyperFund officers or trainers. The individuals who appeared on those schedules were the actual operators and promoters—people like Brenda Chunga, who the SEC identified as serving as Regional Sales Manager and who "eventually became one of only six 'corporate' presenters for HyperFund, and one of only two in the U.S." SEC Complaint ¶ 41. Mr. Burton's absence from the official promotional apparatus demonstrates his independent advisor role rather than an operational role within the company.

The fact that Mr. Burton is not mentioned in the Sam Lee Superseding Indictment, the Brenda Chunga Criminal Information, her Plea Agreement, and the SEC Complaint against both of them is powerfully exculpatory. If the Government believed Mr. Burton possessed the same knowledge and willfulness as Chairman Lee

47

and the Face of HyperFund U.S.A. (Ms. Chunga), it would have charged him alongside them with conspiracy to commit fraud. It did not. The SEC's investigation reviewed the same evidence, examined the same promotional activities, and analyzed the same financial flows. The SEC sued Mr. Lee and Ms. Chunga with securities fraud based on their knowing or reckless participation. The SEC did not sue Burton. These charging decisions by two different federal agencies—one civil, one criminal—reflect a consistent determination that Burton's role and state of mind were fundamentally different from those of the actual operators and knowing participants.

Under these circumstances, the weight of the evidence does not support a finding that Mr. Burton possessed the knowledge and willfulness required for conviction under § 1960. As mentioned, the fundamental question is whether a reasonable person in his position, who relied on (at least):

1. in-person international due diligence interviews with company personnel,
2. *Bloomberg*-verified executives,
3. *Amazon Prime* documentary coverage,
4. official corporate registration of predecessor companies with multi-year operational histories,
5. a university partnership,
6. a designated compliance officer,
7. a company general counsel,
8. mainstream press coverage,
9. endorsements by celebrities, and
10. an endorsement by the co-founder of Apple,

would have known that licensing was required to flip fiat currency into crypto currency for an investment in HyperFund. The SEC's Complaint makes clear that the infrastructure Mr. Burton relied upon was deliberately created by Mr. Lee to appear legitimate. A reasonable person relying on this infrastructure—which

48

included some of the most credible business verification sources in the world—would not have known about licensing deficiencies for converting dollars into crypto. The evidence strongly favors the conclusion that Mr. Burton acted in good faith based on reasonable reliance on apparently legitimate corporate infrastructure that was, in reality, part of an elaborate fraud orchestrated by Sam Lee, Brenda Chunga, and others.

### D.      History and characteristics (18 U.S.C. § 3142(g)(3))

Mr. Burton's personal history and characteristics weigh heavily in favor of release for, at least, three reasons. **First**, he spent his entire adult life in service to his community. As mentioned in Section I, Bitcoin Rodney is a lifestyle brand. A key part of that brand is giving back to the community. For that giving back, Mr. Burton received the highest recognition from elected officials and community leaders. That giving back also includes motivational speaking and financial donations. All of this plays a part (along with the above-mentioned financial advising) in the lifestyle brand that is Bitcoin Rodney. The motto of Bitcoin Rodney is "From the Basement." The brand started in 2017 and allowed Mr. Burton the platform to give back to the community. **Second**, Mr. Burton has deep family and professional ties to the District of Columbia metropolitan area. He also has some health issues, which are better handled in a non-carceral setting. **Third**, Mr. Burton has a minimal criminal history, stemming from an 18-year-old drug conviction. That low point was Mr. Burton's metaphorical basement. From that basement, Mr. Burton built an improved life for

himself and others. From that basement, Mr. Burton better learned to comply with

institutional rules and court-ordered conditions.

### 1. The creation of Bitcoin Rodney "From the Basement" allowed Mr. Burton to help himself and others.

Rodney Burton, better recognized as "Bitcoin Rodney," is an entrepreneur and cryptocurrency investor that spent five years incarcerated. Upon his release in August 2010, he took on a new mindset that has led to him being one of the most successful investors in the bitcoin industry today.

DJ Bluetec, *HipHop Canada*, Nov. 9, 2021[49]

Rodney Burton has created a lifestyle brand—Bitcoin Rodney—that influences

everything from HipHop culture, cryptocurrency, real estate, the cannabis industry,

social media, to the metaverse and more. Established in 2017, the motto of Bitcoin

Rodney is:



---

[49] DJ Bluetec, "Breakfast Club: Bitcoin Rodney talks cryptocurrency & Reinvent Yourself with Crypto conference starting Nov. 18," *HipHop Canada* (Nov. 9, 2021), https://hiphopcanada.com/breakfast-club-bitcoin-rodney-interview/. Mr. Burton was locked up in a federal cage until 2011—not 2010. *Rodney Burton*, 07-CR-0113 (E.D. Va), Dkt. No. 107 (Order Terminating Supervised Release).

"From the Basement" is the metaphor that drives Mr. Burton to this day. Not only did he grow up poor in the streets of Washington, D.C., but also, in 2007, he was convicted of possession with intent to distribute cocaine. For that crime, he was caged for about four years in federal prison.

Upon his release and in the basement of life, Mr. Burton committed himself to not only his success, but also, the success of people like him. At first, he struggled in the cryptocurrency space. In his own *public* words, he lost millions of dollars in various crypto investment ventures. But eventually, he figured out how to invest in cryptocurrency, and the Bitcoin Rodney brand was created—"From the Basement."

The Bitcoin Rodney brand became synonymous with nice things—a yacht, a Lamborghini, a rap song about Bitcoin Rodney:





But, as explained, the Bitcoin Rodney lifestyle brand was not just about nice things, it was about lifting other people up "From the Basement." Toward that end, Mr. Burton put on conferences in Miami on financial empowerment (via

51

cryptocurrency investment), leadership development, real estate development, and other topics where he advised, consulted, and mentored people to be their best. He created networks and a community of people trying to succeed the right way. In his words, "your network is your net worth."

For example, in Miami at the Loews Hotel, from November 18 to 20, 2021, Mr. Burton hosted his Reinvent Yourself with Crypto conference. It had everything from celebrities to leaders in crypto investment. It tackled "From the Basement" topics such as "bridging the wealth gap." The following photos give a sense of the success of that 2021 conference:

[50]

<hr />

[50] HyperFund General Counsel Ryan Xu was supposed to address the conference. He did not show. But Mr. Burton would not have invited him to share the stage with his network of people like Jamie Foxx and Marlon Wayans and risk that network, if Mr. Burton truly believed HyperFund was a fraud. This fact is another reason to release Mr. Burton on conditions under 18 U.S.C. § 3142.



The Bitcoin Rodney lifestyle brand is not limited to nice things and conferences, "From the Basement" also means volunteering in the community by helping veterans and supporting local schools. In 2022, Mr. Burton received the Presidential Lifetime Achievement Award from President Joseph Biden for his lifelong commitment to building a stronger nation through volunteering. This is among the highest civilian honors the nation bestows for community service and

volunteerism. To qualify for the award, Mr. Burton completed over 4,000 hours of volunteer service. Here are photos of the award and the award ceremony:



In 2023, the American Veterans Ball (AVB) gave Mr. Burton its Heroes Award. The AVB is a non-profit organization dedicated to assisting veterans who feel disconnected from the military services once they transition to non-military life. Mr. Burton devotes substantial time and resources to supporting military veterans and their families. This work includes direct financial assistance to individual veterans in need. Below are photos of Bitcoin Rodney in 2023 receiving the AVB Heroes Award:

54



Local and state leaders have repeatedly recognized Mr. Burton's contributions to the communities of the District of Columbia, Maryland, and Virigina (DMV). For example, in 2021, former State's Attorney for Prince George's County Aisha Braveboy recognized Mr. Burton for his induction into the DMV 48 Men of Power. This is an honor provided to African American men who have done exemplary work in the community. So important is this award that former Maryland Comptroller Peter Franchot also recognized Mr. Burton for his accomplishment. In 2023, Rev. Dr. Terry Lee bestowed Mr. Burton with the Partnership Appreciation Award.  The White House Prayer For Our Nation initiative presented this award. It is an organization Rev. Dr. Lee created to gather people to pray for the president, other government leaders, and the nation. A collage of these awards appears below:

55







On November 14, 2021, Mr. Burton donated a $200,000 piano to the Richard Wright Charter School for Journalism and Media Arts in Southeast, Washington, D.C. A building plaque commemorates this substantial charitable contribution, which directly supports educational opportunities for young people. This level of financial commitment to local education demonstrates the substance of the Bitcoin Rodney

56

lifestyle. Mr. Burton's social media post about his donation well explains what he and his lifestyle brand mean:



### 2. Mr. Burton's family ties to the DMV and his health issues.

Mr. Burton is not a transient visitor to this District; he is a native. As his initial defense counsel proffered during the July 8, 2024, hearing, Mr. Burton grew up in the District of Columbia and has been a lifelong resident of the area. *See* Sealed Det. Hrg. Tr. (July 8, 2024) 62:25–63:3. His connection to the community is reinforced by the presence of his extended family, including his son and his aunt, both of whom reside in Maryland.

Mr. Burton's aunt, Linda Wells, is a resident of Clinton, Maryland. *Id.* at 60:12–13. Ms. Wells is not merely a passive family member; she appeared in court to support Mr. Burton and has explicitly agreed to serve as a third-party custodian, permitting Mr. Burton to reside with her in Clinton throughout the pendency of this

case. *Id.* at 60:13–15.[51] Additionally, Mr. Burton's son, Rodney Burton Jr., resides in District Heights, Maryland, further cementing Mr. Burton's personal and familial obligations to this community. *Id.* at 64:4–13. These are the enduring bonds of a man who has spent his life in this region.

Beyond family, Mr. Burton has extensive professional and civic connections throughout the community. He has built a reputation throughout the community as a trusted advisor and mentor, featured in national media for this work. He has every incentive to appear for trial and everything to lose by fleeing.

Finally, Mr. Burton unfortunately suffers from recently diagnosed periodontal gum disease, a chronic condition requiring specialized dental care. While not life-threatening, this condition is more effectively managed outside the carceral setting, where he can access regular dental examinations, specialized periodontal treatment, appropriate oral hygiene products, and nutritional support for good oral health.

> **3.  While Mr. Burton's 2007 drug conviction was his "basement," it allowed him to build respect for the law.**

Even Mr. Burton's criminal history is consistent with releasing him on bond in this case. On March 1, 2007, a criminal complaint charged Mr. Burton for conspiring to distribute five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) & 846. *United States v. Rodney Burton*, 07-CR-0113 (E.D. Va), Dkt. No. 1. Mr. Burton faced a mandatory minimum ten-year prison term and a maximum prison term of life. 21

---

[51]  Mr. Burton's uncle has also volunteered to serve the Court as a third-party custodian, if need be.

U.S.C. §§ 841(b)(1)(A)(ii) & 846. By comparison, in this case, Mr. Burton faces a five-year maximum sentence for conspiracy to operate an unlicensed money transmitting business. 18 U.S.C. §§ 371 & 1960. As here, the Virginia federal court initially detained Mr. Burton. *Burton*, 07-CR-0113 (E.D. Va), Dkt. No. 7. Then, after a motion for reconsideration, Judge Claude M. Hilton released Mr. Burton on conditions, including that Mr. Burton's aunt Linda Wells serve as a third-party custodian. *Burton*, 07-CR-0113 (E.D. Va), Dkt. Nos. 32 (Motion for Reconsideration) & 37 (Order of Release). On May 4, 2007, Mr. Burton pled guilty to conspiracy to distribute 500 grams of cocaine. *Burton*, 07-CR-0113 (E.D. Va), Dkt. No. 45 (Plea Agreement). Unfortunately, on May 28, 2007, and before sentencing, Mr. Burton violated his conditions of release by leaving his home and being arrested for simple assault in Washington, D.C. *Burton*, 07-CR-0113 (E.D. Va), Dkt. Nos. 72 (Petition to Revoke Conditions) & 81 (Order Revoking Conditions). On July 7, 2007, Judge Hilton sentenced Mr. Burton to five years in prison and four years of supervised release. *Burton*, 07-CR-0113 (E.D. Va), Dkt. Nos. 90 (Judgment in a Criminal Case). He returned to the community from the cages of prison on January 11, 2011. *Rodney Burton*, 07-CR-0113 (E.D. Va), Dkt. No. 107 (Order Terminating Supervised Release). Fortunately, Mr. Burton demonstrated that he knows how to comply with court-ordered conditions. After about two and a half years of supervised release, Mr. Burton's probation officer wrote Judge Hilton for Mr. Burton's early termination from supervised release. The probation officer wrote that Mr. Burton "complied with the rules and regulations of supervised release and [was] no longer in need of

supervision;" accordingly, Judge Hilton terminated supervised release early. *Rodney Burton*, 07-CR-0113 (E.D. Va), Dkt. No. 107 (Order Terminating Supervised Release). In sum, Mr. Burton failed, learned, and finally demonstrated that he knows how to follow court-ordered conditions. There is no reason to believe that Mr. Burton will not now comply with this Court's orders just like he eventually complied with Judge Hitlon's—when he faced more prison time over 18 years ago.

This Court need not go back 18 years to see how Mr. Burton addresses government-mandated rules; it can evaluate Mr. Burton's last ~~22~~23 months and ~~29~~7 days to see that Mr. Burton follows the rules. Since his detention on January 3, 2024, Mr. Burton has completed 39 hours of educational coursework and successfully finishing 17 courses. *See* Carceral Class Tr. at 1-4 (Ex. 5). These courses span business leadership, cryptocurrency education, digital marketing, artificial intelligence, social media strategy, job seeking skills, business planning, legal processes, and personal development. His completion of courses on topics like "Job Seeking with a Criminal Record" and "Criminal Process: The Basics" demonstrates his constructive approach to his current situation and his focus on productive reentry. *Id*. His voluntary engagement with business and technology courses reflects his ongoing commitment to education and self-improvement.

This carceral educational achievement is significant for two reasons. **First**, it demonstrates Mr. Burton's ability to follow government-sanctioned directions and carceral rules. He has completed structured courses, met all requirements, and shown consistent compliance with carceral regulations. No disciplinary issues have arisen

60

during his pre-trial incarceration. **Second**, it shows his commitment to prepare for a law-abiding and productive life as he fights this case at the pre-trial stage. These are not the actions of someone who intends to flee or who lacks commitment to lawful conduct going forward.

      **E.**     **Nature and seriousness of the danger to the community (18 U.S.C. § 3142(g)(4))**

As Judge Aslan acknowledged at the initial detention hearing, dangerousness is "not a factor here." Detention Hr'g Tr. (Jan. 24, 2024) 35:4-5. Nothing has changed to warrant a different conclusion.

But, Judge Bennett stated, "financial danger can be included in [18 U.S.C. § 3142(g)(4)]." Sealed Detention Hrg. Tr. (July 8, 2024) 75:17-22. Courts have discretion in deciding danger under 18 U.S.C. § 3142(g)(4). "Selling narcotics, for example, is different than identity theft, which is different than carjacking. Having identified the specific nature of the danger and how serious it is, the Court then must consider available release conditions that will address those concerns and 'reasonably assure' the safety of the community. The statute requires 'reasonable assurance,' not a 'guarantee.'" *United States v. Davis*, 449 F. Supp. 3d 532, 539 (D. Md. 2020) (finding no danger under 18 U.S.C. § 3142(g)(4) in a cocaine and fentanyl conspiracy and possession with intent to distribute case). Finally, the Court must make its determination regarding danger by clear and convincing evidence. *United States v. Wilder*, 2025 WL 2467688, at *2 (S.D.W. Va. 2025).

For three key reasons, the government cannot prove by clear and convincing evidence that Mr. Burton poses a danger. **First**, § 1960 addresses licensing

61

requirements for money transmitting businesses. This case involves no violence, no threat of violence, no weapons, no drugs, no physical harm, no intimidation, no stalking, and no harassment. It is purely a financial and regulatory case, which should not be a criminal case under the Blanche Memo. No aggravating factors suggesting dangerousness are present. **Second**, the nature of Mr. Burton's community service work demonstrates that he poses no danger. He has devoted years to supporting military veterans and their families, as recognized by the AVB Heroes Award. He has mentored youth, speaking regularly at schools about positive topics like goal setting, personal development, and financial literacy. He funded the Richard Wright Charter School in D.C. with a $200,000 donation. He received the Presidential Lifetime Achievement Award specifically for "foster[ing] hope and healing in our nation[]." These are not the activities of a dangerous person. These are the activities of someone committed to helping others and strengthening the community. **Third**, by the Government's own charging decisions, Ms. Chunga is more culpable in this HyperFund debacle. She is free on pre-trial conditions of release—so should Mr. Burton be.

### III.    Mr. Burton's 12-step release plan

Mr. Burton proposes a 12-step release plan. His plan provides comprehensive conditions of release that adequately address any residual concerns about flight risk while protecting the community and the integrity of the proceedings. These dozen conditions are:

**First**, twenty-four-hour Global Position System monitoring through an ankle bracelet with real-time location tracking. This technology provides immediate alerts for any violations and ensures that Mr. Burton's whereabouts are known at all times.

**Second**, home detention restricting Mr. Burton to his approved residence, except for pre-approved activities such as court appearances, meetings with counsel, medical appointments, and religious services. This substantially limits his mobility and freedom of movement.

**Third**, a third-party custodian arrangement with Mr. Burton's aunt, Linda Wells, who would guarantee his appearance, monitor his compliance with conditions, and immediately report any violations. The involvement of a family member who has a personal stake in ensuring compliance provides an additional layer of accountability. If the Court needs an additional third-party custodian, then Mr. Burton's uncle is also available. He lives with Ms. Wells.

**Fourth**, an unsecured personal recognizance bond. While Mr. Burton would like to secure this bond with assets, he has nearly none.

**Fifth**, surrender of all passports to Pretrial Services, with no international travel permitted and geographic restriction to the Maryland and District of Columbia areas. Without a passport, Mr. Burton would have no ability to board international flights on commercial carriers. Any exceptions to the geographic restriction would require prior court approval.

**Sixth**, weekly in-person reporting to Pretrial Services and weekly telephone check-ins. Mr. Burton would be required to maintain current address and contact information at all times.

**Seventh**, prohibition on contact with alleged co-conspirators including Sam Lee, Brenda Chunga, and Ryan Xu, as well as prohibition on contact with identified victims and witnesses. The only exception would be contact in the context of legal proceedings and/or via his Defense team as it continues to investigate the case.

**Eighth**, authorization to continue community service work, including veterans support and youth mentorship. This allows Mr. Burton to continue his decades-long pattern of community service.

**Ninth**, authorization to seek and maintain employment.

**Tenth**, permission to continue medical and dental treatment for his periodontal condition, with required attendance at all scheduled appointments and provision of documentation to Pretrial Services.

63

**Eleventh**, standard conditions including committing no crimes, appearing for all court proceedings, possessing no firearms or dangerous weapons, submitting to searches, and using no illegal drugs or excessive alcohol.

**Twelfth**, enhanced monitoring provisions including unannounced home visits by Pretrial Services, unannounced workplace visits, additional check-in requirements as deemed necessary, and participation in any required treatment or counseling programs. Importantly, Mr. Burton understands that any violation would result in immediate arrest and detention pending trial, with no second chances for material violations.

These 12-step release plan provides multiple overlapping layers of supervision and accountability. They substantially restrict Mr. Burton's liberty, while allowing him to fight his case (including raising money to do so), maintain family connections, receive necessary medical care, and continue constructive community service. They address flight risk through monitoring, home detention, passport surrender, geographic restrictions, and frequent reporting. They address the non-existent community safety issue through contact prohibitions and activity restrictions. They ensure transparency through device monitoring. They provide immediate consequences for any violation.

The proposed conditions are more restrictive than those imposed on many people charged with far more serious offenses—like Brenda Chunga. They are specifically tailored to address the unique circumstances of this case. Mr. Burton is willing to accept these comprehensive restrictions to secure his pre-trial release, demonstrate his commitment to full compliance with court orders, and ultimately win his case.

64

CONCLUSION

Mr. Burton respectfully requests that this Court: (1) reopen the detention hearing under 18 U.S.C. § 3142(f), given that new material information demonstrates that the four statutory factors support release, and (2) order his release to follow the comprehensive dozen conditions proposed. A proposed order is attached as Exhibit 6.

Respectfully submitted,

*/s/ Kobie Flowers*
Kobie Flowers
Fed. Bar # 16511
Flowers Keller LLP
1601 Connecticut Avenue, NW
Washington, D.C. 20009
o 202.993.1282
d 202.521.8742
kflowers@flowerskeller.com

Attorney for Rodney Burton

65